FILED
2013 Sep-04  AM 11:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

DAVID MAC SPARKS,

    PLAINTIFF,

vs.                                             CV 3:12-CV-02544-IPJ

SUNSHINE MILLS, INC.,

    DEFENDANT.

## <u>MEMORANDUM OPINION</u>

Pending before this court is Defendant Sunshine Mills, Inc.'s motion for summary judgment (doc. 35), brief in support of said motion (doc. 36), and evidentiary materials in support of said motion (doc. 37). Plaintiff David Mac Sparks filed a response in opposition to Sunshine Mills's motion (doc. 41) and evidentiary material in opposition to said motion (doc. 40) to which Sunshine Mills replied (doc. 42). Also pending is Defendant's motion to strike evidentiary material (doc. 44) and Plaintiff's response to said motion (doc. 45).

## <u>FACTUAL BACKGROUND</u>

Defendant Sunshine Mills, Inc. ("Sunshine"), a pet food and treat manufacturing company, owns and operates a plant in Red Bay, Alabama. Decl. of

Janeice Gober[1] ¶ 3 (doc. 37-1). Plaintiff David "Mac" Sparks began working at Sunshine's Red Bay Plant as a temporary employee in June 2006. Plaintiff Depo. pp. 18-19 (doc. 37-2). Sparks became a full-time employee at the Red Bay Plant in September 2006 and worked as an Expander Operator there until Sunshine terminated him on August 5, 2010 *Id.* at 53. At the time Sparks worked at Sunshine, Sunshine employed Michael Myrick as Sparks's immediate supervisor, Charles "June" Holland as the Plant Superintendent, and Mark Suiter as the Plant Manager. *Id.* at 56.

As an Expander Operator, Sparks was responsible for the following: putting ingredients such as salt, corn, and rice bran in the mixer; sending the ingredients to the expander machine; adding dye, if necessary; and checking the food's moisture as it left the machine. Plaintiff Depo. at 57-58. Expander Operators complete this process approximately four or five times until an order is complete. Holland Depo. p. 30 (doc. 37-3). Each batch ranges from 4,300 to 4,500 pounds, and Expander Operators run several batches a day, totaling an average of fifty to sixty thousand pounds of dog food each shift. *Id.* at 20, 29. In running the Extruder, the Expander Operator also manages raw materials, sorts unsuitable materials, and inspects

---

[1] Janeice Gober is Defendant's Human Resources Manager and has been so since 2007. *Id.* at ¶ 1.

materials throughout the process. Plaintiff Depo. at 85.

Sunshine has no written disciplinary policy, but claims to follow a "three write-up rule." Gober Depo. pp. 5-6 (doc. 37-4); Decl. of Gober at ¶ 6. According to this rule, an employee generally receives "three serious or critical write-ups" before being terminated. Gober Depo. at 39. Sparks disputes that Sunshine has a "three write-up rule," and insists that "there does not appear to be rhyme nor reason to employee discipline at Sunshine." Plaintiff's Response p. 2 (doc. 41). Holland, Suiter, and Gober all testified that employees are not automatically fired after receiving three write-ups, nor are employees guaranteed future employment by virtue of not having violated the three write-up policy. Holland Depo. at 72; Gober Decl. at ¶ 6; Suiter Depo. p. 124 (doc. 37-6). Neither party disputes that Sunshine distributes a Good Manufacturing Policy ("GMP"), which provides that an employee may be disciplined, including termination, for jeopardizing feed quality. Plaintiff Depo. at 84-85. Additionally, neither party disputes that Sparks received, reviewed, and understood the GMP. *Id.* at 68.

On September 17, 2009, Holland issued Sparks a write-up for running his feed at the wrong density, a production error that could have resulted in termination had Sparks not improved his performance. Plaintiff Depo. at 90-91; Disciplinary Notice of 09/17/09 (doc. 37-7). On April 19, 2010, Sparks allegedly

received another write-up after he ran "feed from the dryer to the bed instead of to regrind, after being told to put in regrind. Adjusting Propylene Glycol and corn syrup and caused feed to blow apart." Disciplinary Notice of 04/19/10 (doc. 37-8). Sparks disputes the validity of this write-up as it was unsigned by any supervisor. Suiter Depo. at 74. On June 7, 2010, while at work, Sparks stepped backward into a hole while sweeping under the dryer and twisted his ankle. Plaintiff Depo. at 115-16. Sparks saw a doctor on the day he injured his ankle and returned to work unrestricted. *Id.* at 120. Subsequently, Sparks received workers' compensation benefits *Id.* at 173-76. Sparks also started physical therapy and anti-inflammatory medication, but remained on full-duty status until he was terminated. *Id.* at 133-34.

On July 27, 2010, Holland issued Sparks another write-up for failing to "adjust the feed flow on the troll[e]y," which caused "the bed [to run] over onto the catwalk and locked up the trolley." Plaintiff Depo. at 98; Disciplinary Notice of 07/27/10 (doc. 37-9). Sparks disputes that the July 27th incident constituted a production error on his part, because the trolley was locked up when Sparks started the machine; Sparks and his partner promptly tried to unclog it; but Holland wrote Sparks up even though Sparks had done nothing wrong. Plaintiff Depo. at 98-104. Sparks also claims that these type of incidents occur weekly without resulting in operator discipline. Decl. of Plaintiff ¶ 3 (doc. 40-30).

4

Sparks claims that on July 28, 2010, he informed Mr. Myrick that "the way it was looking,. . . it was very possible that he was going to have to have surgery." Sparks alleges that on July 29, 2010, he informed Mr. Holland of the same. Plaintiff Depo. at 122, 140-41. Sparks claims that on July 28, his physician told him that it was "possible that he might have to do surgery." *Id.* at 135. Sparks's physician, Dr. Goodman, testified at his deposition that the notes from his July 28 visit with Sparks did not indicate a plan for surgery. Goodman Depo. pp. 15-17 (doc. 37-10). Dr. Goodman further testified that he did not recommend surgery to Sparks until August 23. *Id.* at 18. Sparks claims that Holland said "okay" when he told him about the possibility of surgery, but that Holland "looked like he was a little upset." Plaintiff Depo. at 125-26. Sparks admits that he was not incapacitated for more than three or more consecutive days because of his injury and that his injury did not prevent him from doing anything. *Id.* at 204.

Sunshine claims that on August 3, 2010, Sparks "produce[d] very large and small pieces of the 3072 'stick' product," "choked up the oscil[l]ator and trolley," and "sent [the feed] to regrind but [the] slide gates were still set for regular bins which cross-contaminated feed." Disciplinary Notice of 08/03/10 (doc. 40-2). Holland claims that Sparks's production error resulted in the loss of 35,000 pounds of feed. Holland Depo. at 131. Sparks disputes the validity of the August

5

3rd write-up as it was unsigned by any supervisor. Plaintiff Depo. at 107-08, 111-13. Instead, Sparks claims, he tried to send the feed to regrind. Sparks does not dispute the August 3, 2010, incident but maintains it was not his fault. *Id.*

Sunshine claims that Holland informed Suiter of the incident and suggested that Sparks be terminated. Holland Depo. at 87-88, 140-41. Sparks claims that Suiter suggested suspension for Sparks and that Holland continued to recommend termination. Plaintiff Depo. at 108. Holland, however, maintains that Suiter made the decision to terminate Sparks. *Id.* at 154. Sunshine maintains that on August 3, Sparks failed to perform his duties satisfactorily and failed to take steps that he had taken "as a matter of routine for years." Holland Depo. at 104. On August 4, 2010, Sparks took the day off to attend a doctor's appointment. Plaintiff Depo. at 114. When Sparks returned to work on August 5, 2010, Suiter informed him that he was being terminated. Holland Depo. at 105.

On April 27, 2011, Sparks executed a Petition to Approve Worker's Compensation Settlement Agreement with Sunshine, which stated the following:

> Plaintiff understands that this settlement, if approved, is a compromise of all claims which Plaintiff may now have or may have in the future as a result of this injury, and that no further Worker's Compensation benefits, vocational rehabilitation or vocational rehabilitation expenses will be paid as a result of the aforesaid accident and injury. All parties agree that this settlement contains the entire agreement between the parties hereto, and that there are no agreements or understandings other

than as set forth herein.

(doc. 37-12 pp. 2-3). Further, on April 27, 2011, a Franklin County Circuit Court

entered an order approving the settlement and petition which provided as follows:

> It is further ORDERED, ADJUDGED, and DECREED by the Court that upon payment of said sum and the court costs the Defendant is discharged from any further liability to the plaintiff arising from the accident made the basis of the plaintiff's complaint except that the Defendant shall continue to be liable to the plaintiff for any future medical or surgical benefits provided by the Act.

(doc. 37-13 p. 2).

Sparks filed his complaint with this court on July 25, 2012 (doc. 1).

## STANDARD OF REVIEW

A court may grant a movant's motion for summary judgment "when the

pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820

(11th Cir. 2010); *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316,

1318 (11th Cir. 2012). An issue is "material" if it is a legal element of the claim

under the applicable substantive law which might affect the outcome of the case. It

is "genuine" if the record taken as a whole could lead a rational trier of fact to find

for the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.

1997).

In determining whether to grant the motion, the court must view "the evidence and all reasonable inferences from that evidence. . . in the light most favorable to the nonmovant." *Id*; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). However, the court need only draw those inferences "to the extent supportable by the record." *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010). Once met by the moving party, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillards, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## LEGAL ANALYSIS

Sparks presents the following claims to the court: (1) Sunshine violated the FMLA by terminating him "because he exercised his rights under the FMLA or because [he] would need FMLA leave in the future," and (2) his termination was in retaliation for having filed a workers' compensation claim and, therefore, in violation Alabama Code 25-5-11.1. Complaint at ¶¶ 18, 21 (doc. 1). Sunshine argues it is entitled to summary judgment for the following reasons: (1) the release Sparks signed as part of his workers' compensation settlement agreement bars the claims Sparks now asserts; (2) Sparks's interference claim fails because he was not entitled to FMLA benefits, as he could not establish that he suffered from a serious health condition; (3) Sparks's FMLA retaliation claim fails because he did not engage in protected activity and he fails to demonstrate that his termination was pretext for retaliation; (4) both Sparks's FMLA claims fail because he did not provide Sunshine adequate notice of his FMLA-required leave; and (5) Sparks's 25-5-11.1 claim fails because he cannot establish that his filing of a workers' compensation claim was the sole basis for his termination or that his termination was pretext for retaliation. Defendant's Memo. pp. 1-2 (doc. 36).

The Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2612, guarantees that certain "covered" employees receive unpaid leave for serious health

conditions that make the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a)(1)(D). It prohibits employers from interfering with employees' FMLA rights or retaliating against them for attempting to use or using their FMLA rights. 29 U.S.C. § 2615. *See also* 29 C.F.R. § 825.220. Section 25-5-11.1 of the Alabama Code provides that "[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of Section 25-5-11." Ala. Code § 25-5-11.1 (1975).

## I. Waiver of Sparks's Retaliatory Discharge and FMLA Claims

### A. Section 25-5-11.1 Retaliatory Discharge Claim

The key issue in determining whether Sparks waived his retaliatory discharge claim in the settlement agreement is whether the retaliatory discharge claim arises under Alabama's workers' compensation laws. The Alabama Supreme Court has determined that "[u]nless there is evidence of fraud, a settlement of an employee's claims under the Workmen's Compensation Act is conclusive of any other claims the worker may have." *Sanders v. Southern Risk Services*, 603 So. 2d 994, 995 (Ala. 1992). In *Sanders*, the plaintiff signed a workers' compensation

agreement that released the employer "from all claims on account of said injury, under said Act or otherwise." *Sanders*, 603 So. 2d at 995 (Ala. 1992). The court determined that the plaintiff's retaliatory discharge claim was barred by the valid release. *Id.* at 995-96.

Likewise, in *Gates Rubber Co v. Cantrell*, 678 So. 2d 754, 755-56 (Ala. 1996), the Alabama Supreme Court held that a plaintiff could not bring a retaliatory discharge claim based on § 25-5-11.1, because he signed an agreement releasing "the defendant and its workmen's compensation insurance carrier from any and all liability now accrued or hereafter to accrue for compensation and vocational rehabilitation benefits under the workman's compensation laws of the State of Alabama, or otherwise." Similarly, in *Brown v. B & D Plastics*, 873 F. Supp. 1511, 1515 n. 4 (M.D. Ala. 1994), a district court noted that "general release agreements signed in settlement of workers' compensation claims preclude retaliatory discharge claims which are filed because of perceived backlash in reaction to filing a workers' compensation claim."

Additionally, in the context of 28 U.S.C. § 1445 (c), which prohibits federal removal of claims arising under state workers' compensation laws, the Eleventh Circuit has determined that a § 25-5-11.1 retaliatory discharge claim arises under Alabama's workers' compensation laws. *Reed v. Heil Co.*, 206 F.3d 1055, 1060

11

(11th Cir. 2000). *See also B & D Plastics*, 873 F. Supp. at 1515 n. 4 (M.D. Ala. 1994) ("The workers' compensation claim and the retaliatory discharge claim can be justifiably deemed to have arisen from the same injury because but for the workers' compensation claim, the retaliatory discharge claim would not have been filed").

The Alabama Supreme Court has also determined that both § 25-5-11 and § 25-5-11.1 claims are tort claims. *Dudley v. Mesa Industries*, 770 So. 2d 1082, 1084 (Ala. 2000); *Jackson County Hospital v. Alabama Hospital Association Trust*, 619 So. 2d 1369, 1371 (Ala. 1993). And, in *Dudley*, 770 So. 2d at 1084 (Ala. 2000), the court reasoned that because the plaintiff's § 25-5-11 claim was a tort action, it was not barred by the settlement agreement that released the defendant "from all claims for 'compensation and vocational rehabilitation benefits' arising under the Workers' Compensation Act." *Id.* In that case, the trial court approved a settlement agreement ordering that "the employer be released and forever discharged from any and all claims for compensation and vocational rehabilitation benefits due or which may become due to the employee under the Workmen's Compensation Act of Alabama." *Dudley*, 770 So. 2d at 1083 (Ala. 2000). At the same time that the trial court approved the agreement, however, it also permitted the plaintiff to amend his complaint to add additional claims and

12

additional defendants other than the employer. The trial court subsequently granted these defendants' motion to dismiss, presumably dismissing all of Dudley's claims. The Alabama Supreme Court held that Dudley's claims in the amended complaint were not adjudicated and could continue because they were based on 25-5-11, "a tort claim for damages, . . . not a claim for workers' compensation benefits." *Id.* at 1084-85.

*Dudley*, however, may be distinguished from the case at hand on two grounds. First, the language included in the settlement agreement in this case is broader than that of the agreement in *Dudley*. While *Dudley* limited the release to "any and all claims for compensation and vocational rehabilitation benefits," Sparks's release provides that "this settlement, if approved, is a compromise *of all claims* which Plaintiff may now have or may have in the future as a result of this *injury*." (emphasis added). Sparks's release does not immediately qualify "claims" with "for compensation and vocational rehabilitation benefits." Although Sparks argues that the overall language of the settlement agreement makes it clear that it is limited to workers' compensation claims, the Alabama Supreme Court, in *Sanders* and *Cantrell*, did not read similar settlement agreements so narrowly.

Second, the court in *Dudley* dealt specifically with § 25-5-11, which differs from the standard workers' compensation retaliation claim. The plaintiff in

13

*Dudley* sought damages under § 25-5-11, alleging in his amendment that the non-employer defendant "had failed to properly maintain a safety device." *Dudley*, 770 So. 2d at 1084 (Ala. 2000). Additionally, the plaintiff in *Dudley*, by his amendment claimed fraud against his employer in the handling of the workers' compensation claim. Thus, *Dudley* falls under the exception in *Sanders*, which held "unless there is *evidence of fraud*," the settlement of an employee's claims under the Workman's Compensation Act is conclusive of any other claim the worker may have. *Sanders*, 603 So. 2d at 995 (emphasis added). Here, Sparks brings suit under § 25-5-11.1, alleging a standard retaliatory discharge claim. Thus, Sparks's claim is of the exact nature as the claims discussed in *Sanders*, *Cantrell*, and *B & D Plastics*, and is, therefore, precluded by the settlement agreement. Moreover, Sparks executed the release on April 27, 2011, more than eight months after his termination. The court cannot conceive how Sparks might not have been aware of his retaliatory discharge claim at the time he signed the release, eight months after his discharge.

Sparks's response to Sunshine's Motion for Summary Judgment contains an assertion that even though he does not allege intentional fraud, "if the release is interpreted to bar plaintiff's termination claims, the representations by Sunshine's lawyer regarding the limits of the release (to worker's compensation claims)

would be false and a basis for invalidating the release." Plaintiff's Response at 15 (doc. 41). Sparks points to no facts to support this assertion nor does the record support this finding. Thus, because there is no evidence of fraud, the release Sparks signed as part of the workers' compensation settlement agreement bars him from asserting his retaliatory discharge claim pursuant to Alabama Code Section 25-5-11.1.

### B. FMLA Claims

Because state remedial statutes and federal remedial statutes "were promulgated by their respective legislatures to remedy different ills . . . court[s] dee[m] it unwise and imprudent to permit an agreement consummated in satisfaction of a workers' compensation claim to preclude vindication of a cognizable federal right or frustrate available federal remedies absent an express release of such rights." *B & D Plastics*, *Inc.*, 873 F. Supp. 1511, 1515 (M.D. Ala. 1994). Further, the waiver of federal remedial rights "'must be closely scrutinized,' and a court must look to the totality of the circumstances to determine whether the release is knowing and voluntary." *Bledsoe v. Palm Beach City*, 133 F.3d 816, 819 (11th Cir. 1998) (quoting *Puentes v. United Parcel Service*, 86 F.3d 196, 198 (11th Cir. 1996)). To determine whether a plaintiff knowingly and voluntarily waived remedial rights, courts must consider:

the plaintiff's education and business experience; the amount of time the plaintiff considered the agreement before signing it; the clarity of the agreement; the plaintiff's opportunity to consult with an attorney; the employer's encouragement or discouragement of consultation with an attorney; and the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled.

*Id.*

The court cannot determine from the parties' submissions that Sparks knowingly and voluntarily waived his FMLA rights in the workers' compensation settlement petition. Sparks has a high school education and completed two years of college at Northwest-Shoals in Phil Campbell. Plaintiff Depo. at 14-15. Moreover, he claims that he did not understand that he could hire an attorney for the proceeding and that he only understood the release to relate to his workers' compensation claims:

> [MS. STEWART]: And you understood that that was a form of release?

> [MR. SPARKS]: Yes, to workmen's comp.

Plaintiff Depo. at 175-77.

> [MS. STEWART]: And do you believe you were given ample time to consider this Petition and review it?

> [MR. SPARKS]: Yes.

> [MS. STEWART]: Were you given the opportunity to hire an attorney if you wanted to, to review that?

> [MR. SPARKS]: Never got told I could, no. . . .

> [MS. STEWART]: Did the Judge not tell you that?

16

[MR. SPARKS]: No.

*Id.*

Taking the alleged facts in a light most favorable to Sparks, and assuming his stated level of education and business experience, that he did not have an attorney or was unaware that he could have an attorney, and that he only understood the release to relate to workers' compensation claims, Sparks did not knowingly and voluntarily waive his FMLA claims in the settlement agreement.

## II. Sparks's Section 25-5-11.1 Retaliatory Discharge Claim

### A. Sparks's Prima Facie Retaliatory Discharge Claim

Assuming *arguendo* that Sparks did not waive his workers' compensation retaliatory discharge claim in the release, he still cannot establish that a genuine issue of material fact exists as to his Section 25-5-11.1 claim. A plaintiff establishes a prima facie case of retaliatory discharge by showing: "1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a worker's compensation claim." *Alabama Power Co. v. Aldridge*, 854 So. 2d 554, 563 (Ala. 2002); *Flint Construction Co. v. Hall*, 904 So. 2d 236, 247 (Ala. 2004); *Blue*

17

*Circle Cement, Inc. v. Phillips*, 989 So. 2d 1025, 1029 (Ala. 2007). While

plaintiffs generally prove the first three elements easily, the fourth element often

presents a significant obstacle to retaliatory discharge claims. As to point four, "if

there is uncontradicted evidence of an independently sufficient basis for the

discharge then the defendant is entitled to a judgment as a matter of law."

*Aldridge*, 854 So. 2d at 568 (Ala. 2002).

Further, absent a showing of pretext, an employer's stated legitimate reason

for discharge will abate any genuine issues of material fact:

> "[a]n employer's stated basis for a discharge is sufficient as
> a matter of law when the underlying facts surrounding the
> stated basis for the discharge are undisputed and there is no
> substantial evidence indicating (a) that the stated basis has
> been applied in a discriminatory manner to employees who
> have filed workers' compensation claims, (b) that the stated
> basis conflicts with express company policy on grounds for
> discharge, or (c) that the employer has disavowed the
> stated reason or has otherwise acknowledged its pretextual
> status."

*Id.* Additionally, "proximity in time between the filing of the workers'

compensation claim and discharge" may be "a persuasive factor in establishing a

causal connection." *Id.* at 565.

Here, the parties do not dispute that Sparks had an employment relationship

with *Sunshine Mills* or that Sparks sustained an on-the-job injury. The parties do

18

dispute, however, whether Holland knew of Sparks's injury. Sparks claims that Holland was one of the people who assisted him to the doctor after he injured his ankle. Plaintiff Depo. at 116-17. Holland, however, claims that he had no knowledge of Sparks's on-the-job injury. Holland Depo. at 297. Suiter testified in his deposition that he remembered "that [Sparks] got hurt on the job, and. . . that he he went on light duty. . . ." Suiter Depo. at 96-97.

Even if Sparks's claim that Holland and Suiter knew of his injury is taken as true, to make out a prima facie case of retaliatory discharge, Sparks must still demonstrate that Sunshine terminated him *solely* based on his injury and filing of workers' compensation. In his deposition, Sparks admitted knowing that failure to comply with Sunshine's Good Manufacturing Policy, including "behavior that jeopardizes safety, product quality, or Sunshine property," (doc. 37-1 p. 6) could result in termination. Plaintiff Depo. at 66-68. Moreover, Sparks admitted in his response to Sunshine's motion that he received a written warning for running "his feed at the wrong density" from Holland on September 17, 2009, and that this was a production error. Plaintiff's Response at p. 3, ¶¶ 31, 33.

Sparks also admits receiving another disciplinary note on July 27, 2010, for failing to "adjust the feed flow on the troll[e]y," which caused "the bed [to run] over onto the cat walk and floor and locked up the trolley." Plaintiff Depo. at 98.

Although Sparks disputes that he in fact caused the lock up to occur, he admits in his response to Sunshine's motion that this was a production error. Plaintiff's Response at 3 (doc. 41). Moreover, while Sparks disputes the third infraction that he allegedly committed on August 3, 2010, Holland, Suiter, and Janeice Gober all testified that managers may use their discretion in determining whether to terminate an employee and that an employee does not necessarily have to commit three infractions in order to be terminated. Holland Depo. at 282; Gober Decl. at ¶ 6; Suiter Depo. at 124.

Given that Sunshine has offered a legitimate reason for Sparks's termination, Sparks may only overcome the presumption of the reason's legitimacy by establishing that the reason was pretextual. However, looking at the *Aldridge* factors, there is no substantial evidence that (a) the stated basis of Sparks's termination has been applied in a discriminatory manner to employees who have filed workers' compensation claims; (b) the stated basis conflicts with Sunshine's express policy on grounds for discharge; or (c) Sunshine has disavowed the stated reason or has otherwise acknowledged its pretextual status.

As to point (a), Sparks claims that Michael Young was also terminated shortly after being injured. Disciplinary Notice of Young (doc. 40-14). However, the record gives no indication that Young filed a workers' compensation claim.

Moreover, Sunshine argues, and Holland and Suiter's depositions support, that Michael Young was fired for punching a grain operator. Suiter Depo. at 115; Holland Depo. at 184. Sparks also attempts to point to the suspension of Josh Ridge, who also received two write-ups for production errors but did not file for workers' compensation, as evidence of pretext. Disciplinary Notice of Josh Ridge (doc. 40-16). Sparks surmises that he would have been suspended like Ridge were it not for his workers' compensation claim. Sparks attempts to rely on Suiter's deposition testimony that Sparks's termination "was not fair." Suiter Depo. at 107. However, by Suiter's own admission, he had no basis for comparing the fairness of Sparks and Ridge's disciplinary actions:

> [MR. SHERROD]: Is it possible that if you had not been overruled by somebody else, that you would have suspended Mr. Sparks just like Josh Ridge was suspended? . . .
>
> [MR. SUITER]: I don't recall the termination reasons. . . .

*Id.* Additionally, Gober testified that Sunshine discouraged suspending employees for infractions because another employee would have to be called in to fill the suspended employee's position. Gober Depo. at 40.

Sparks also points to the disciplinary files of Andrew Green, Jeff Henley, Nick Sartin, Roy Mitchell, Anthony Watson, and Shelby Lindley to argue that Sparks was discriminated against for having filed a workers' compensation claim.

21

Sparks claims that Green was fired from World Pet Care and rehired at another

Sunshine facility, Red Bay, despite violating a policy against using racially

derogatory comments. Disciplinary Notice of Green (doc. 40-7). However, the

basis for Sparks's assertion is Suiter's deposition testimony, in which Suiter

claims not to recall any facts surrounding Green's termination and subsequent

hiring at Red Bay:

> [MR. SHERROD]: Okay. Did you ever talk to – do you recall anything
> about the circumstances of Mr. Green either coming to work at Sunshine or,
> you know, being rehired by Sunshine even though he's a no rehire at World
> Pet Care?
>
> [MR. SUITER]: I don't recall.

Suiter Depo. at 121.

Moreover, Holland asserts that Jeff Henley was only written up twice for

production errors, "which he did not consider to be as significant as any of Mr.

Sparks's write-ups as they were not repetitive and did not result in the loss of

significant amount of product." Holland Decl. ¶ 3 (doc. 43-1). The record supports

Holland's assertion, as Jeff Henley only has two disciplinary notices for

production errors and one for "hitting hopper trailers with air stick." *Id.*;

Disciplinary Notices of Jeff Henley (doc. 43-1). The record also shows that Sartin

received no write-ups for production errors, but instead was disciplined for talking

22

on the phone, leaving the back door open, and failing to call in. Holland Decl. at ¶ 4; Disciplinary Notices of Nick Sartin (doc. 43-1). Similarly, Watson was only written up for one production error, the other write-ups being for speeding in the parking lot, running into a beam with a forklift without reporting, and "bad-mouthing his coworkers." Disciplinary Notices of Anthony Watson (doc. 43-1).

Holland further asserts that Mitchell was written up for two production errors that did not result in a significant loss of feed, and was terminated after his third production error resulted in the loss of "approximately 35,000 pounds of feed." Holland Decl. at ¶ 5. Mitchell's disciplinary records do in fact show that Sunshine terminated Mitchell after he received three write-ups, the third resulting in the loss of approximately 25,000 pounds of feed. Disciplinary Records of Roy Mitchell (doc. 43-1). The fact that Sunshine terminated Mitchell after his third production error resulted in a 25,000 pound loss not only demonstrates that Sunshine did in fact follow the three-write up rule in that case, but also that Sunshine would not have been acting out of the ordinary to terminate Sparks after the August 3 incident resulted in a 35,000 pound loss. That Mitchell did not file a workers' compensation claim prior to his termination also demonstrates that Sunshine did *not* treat Sparks differently because of his injury or his workers' compensation claim.

23

Shelby Lindley, Holland claims, was not an extruder operator, like Sparks, and was not written up for significant production errors. Holland Decl. at ¶ 15. The record supports this distinction as well, given that Lindley was a "loader." Disciplinary Notices of Shelby Lindley (doc. 43-1). Suiter's deposition testimony established that "[i]t's difficult" to find a good extruder operator and that the position of extruder operator is "[v]ery important" to the plant's business. Suiter Depo. at 40.

In his response to Sunshine's Motion for Summary Judgment, Sparks claims that Holland started "nitpicking [his] work performance in July after Sparks's ankle injury did not improve." Plaintiff's Response at 23. However, in his deposition, Sparks testified that neither Holland, Myrick, nor Suiter "nitpicked" him about his injury:

[MS. STEWART]: Did Mr. Holland nitpick you after that injury?

[MR. SPARKS]: No.

[MS. STEWART]: Did Mr. Myrick nitpick you after that injury?

[MR. SPARKS]: No.

[MS. STEWART]: What about Mr. Suiter, did he do anything or say anything to you that made you feel like he held you in a negative light because you injured yourself?

[MR. SPARKS]: No.

24

Plaintiff Depo. at 202.

Given that the types of infractions committed by the other employees Sparks referenced are of a different nature and severity than those for which Sparks received write-ups, Sparks has failed to present substantial evidence that Sunshine's workplace policy was applied in a discriminatory manner to employees who filed workers' compensation claims. Importantly, the fact that Mitchell, who did not file a workers' compensation claim, was terminated for ruining 25,000 pounds of feed after receiving two prior warnings supports the exact opposite of Sparks's argument. Rather, Sunshine's termination of Mitchell shows that Sunshine did not apply its disciplinary policy arbitrarily or haphazardly.

As to point (b), Sparks admitted understanding that failure to comply with Sunshine's Good Manufacturing Policy could result in termination. Although Sparks attempts to challenge the validity of two of his write-ups to show that Sunshine's three write-up policy was applied in a discriminatory fashion, Holland, Suiter, and Gober all testified that an employee does not have to receive three write-ups to be terminated. Moreover, Sparks admitted to receiving, reading, and understanding the GMP which noted that "[b]ehavior that jeopardizes. . . product quality" could result in disciplinary action. Plaintiff Depo. at 66-67. So, Sparks has failed to produce substantial evidence that the stated basis for Sparks's

25

termination conflicts with Sunshine's express policy.

Finally, as to point (c), Sparks admitted that neither Mr. Suiter nor Mr. Holland mentioned anything about his injury or alleged need for surgery when he was terminated. Plaintiff Depo. at 202-03; Holland Depo. at 290. Sparks argues that this admission is irrelevant "as supervisory personnel rarely admit they are disciplining or firing an employee for a prohibited reason." Plaintiff's Response at 7 (doc. 41). However, that Suiter and Holland did not disavow their stated reason for Sparks's discharge or otherwise acknowledge its pretextual status is important for this third factor in the causation analysis. Sunshine claims that Holland suggested Sparks be terminated because he did not take the proper steps to avoid contaminating the food bin, "steps that Mr. Sparks had taken as a matter of routine for several years working as an expander operator." Holland testified that he told Suiter that Sparks should be terminated because of "loss of feed [and] loss of time." Holland further denied that he terminated Sparks because he injured himself. He denies ever knowing Sparks injured himself. Holland Depo. at 290.

The Alabama Supreme Court has noted that in certain cases, there may be a jury question as to whether an employer's stated reasons for discharge were pretextual. For example, there may be a genuine issue of material fact where an employer continues to vary the stated reason for the discharge, especially after

26

litigation has commenced. *Flint Construction Co. v. Hall*, 904 So. 2d 236, 251-252 (Ala. 2004). Here, however, the record gives no indication that Sunshine gave any other reasons for terminating Sparks, either prior to or after the commencement of this litigation, other than his production errors. Thus, Sparks fails to make out that Sunshine, or its decision-makers in the present case, disavowed the stated reason for his discharge or otherwise acknowledged it as pretext.

Sparks also argues that the proximity of time between his on-the-job injury and his termination supports his claim that his discharge was retaliatory. Sparks was terminated two months after his injury and claims that this period of time demonstrates a causal connection between his workers' compensation claim and his termination. However, "mere closeness in time typically is not sufficient evidence of a retaliatory discharge." *Coca-Cola Bottling Co. v. Hollander*, 885 So. 2d 125, 131 (Ala. 2003). Rather, "[c]lose temporal proximity between the claim and the termination must be so coincidental as to raise an inference that the claim caused the termination." *Id.* Here, where the termination occurred right after the August 3 incident, Sparks's reliance on the proximity factor fails. Moreover, even if Sparks could establish close temporal proximity between his claim and his termination, the record supports Sunshine's stated reason for Sparks's discharge

27

and demonstrates that the reason was not pretextual. Mere temporal proximity cannot in itself establish that Sparks's discharge was retaliatory.

Because Sparks cannot demonstrate that his on-the-job injury and filing of a workers' compensation claim was the *sole* cause of his termination, he fails to establish a prima facie case of retaliatory discharge. Even assuming, however, that Sparks could establish a prima facie case of retaliatory discharge, because Sparks fails to present substantial evidence of Sunshine's pretext based on the *Aldridge* factors, he cannot establish that Sunshine's proffered reason for terminating him was pretextual.

### B. Collateral Estoppel

Sparks also argues that collateral estoppel bars Sunshine from claiming that Sparks performed poorly on August 3. Sparks bases this argument on the Alabama Department of Industrial Relations' determination in his unemployment compensation claim hearing that Sparks performed to the best of his ability and was not discharged for misconduct. Neither party disputes that Alabama Department of Industrial Relations ("DIR") decisions may have collateral estoppel effect. *Petty v. United Plating, Inc.*, 2012 WL 2047532, at *10 (N.D. Ala. 2012). The Alabama Supreme Court has determined that "state agency decisions have preclusive effect" on subsequent proceedings if:

(1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision.

*Id.* at *11 (quoting *Ex parte Shelby Medical Center Inc*, 564 So. 2d 63, 68 (Ala. 1990)).

Sparks does not attempt to use this argument in support of his FMLA claims, and indeed he would not be able to do so. Sparks's FMLA claims debate issues that were not litigated at the unemployment compensation hearing (e.g., whether he was entitled to benefits, whether he gave Sunshine adequate notice, whether Sunshine acted with discriminatory animus). Thus, Sparks attempts to use this collateral estoppel argument to bar Sunshine from arguing against his workers' compensation retaliatory discharge claim. However, Sunshine correctly asserts that collateral estoppel cannot bar it from litigating an issue that was not actually litigated in the prior proceeding.

Here, there is identity of the parties – Sunshine and Sparks – and identity of the issues – whether Sparks performed so poorly as to warrant termination.[2] Additionally, Sunshine likely had the opportunity to litigate the issue because

---

[2] Sparks's poor performance is determinative of his retaliatory discharge claim, because he alleges that he did not perform poorly and, therefore, was terminated because of his filing of a workers' compensation claim.

29

"Alabama's Unemployment Compensation Act affords parties an adequate opportunity to litigate the issue of discharge in an unemployment compensation claim hearing." *Petty*, 2012 WL 2047532, at * 12 (citing *Wal-Mart Stores Inc. v. Smitherman*, 743 So. 2d 442, 446 (Ala. 1999)). Moreover, the findings on the issue to be estopped, Sparks's work performance, were necessary to the unemployment compensation decision as a person cannot receive unemployment compensation if he was discharged for misconduct as defined in Alabama Code Section 25-4-78(3)(b). "Misconduct" so defined means: conduct evincing a disregard of an employer's interests or of the standards of behavior which he has the right to expect of his employee.

However, even if Sparks could show that four of the five elements of the collateral estoppel test have been met, only Sparks, the claimant, attended the unemployment compensation hearing. Sparks cannot assert that the issue of his misconduct was actually litigated as Sunshine did not attend the hearing or present any evidence contrary to Sparks's allegations. In fact, the Department of Industrial Relations based its decision "on the claimant's unrefuted sworn testimony." Decision on an UEC Claim at 1 (doc. 40-5). Moreover, "Alabama law does not afford collateral-estoppel/issue-preclusive effect to default judgments because a default judgment, by its very nature, cannot satisfy the requirement that the issue

has been 'actually litigated' in a prior action."*Malfatti v. Bank of America*, 99 So. 3d 1221, 1225 (Ala. 2012); *see also Bush v. Balfour Beatty Bahamas, Ltd. (In re Bush)*, 62 F. 3d 1319, 1323 (11th Cir. 1995) ("Ordinarily a default judgment will not support the application of collateral estoppel because in the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated.").

While the DIR decision was not a default judgment per se, that Sunshine did not appear at the hearing or present any evidence in opposition of Sparks's testimony makes the DIR decision tantamount to a default or consent judgment. Accordingly, collateral estoppel cannot apply to prohibit Sunshine from litigating Sparks's retaliatory discharge claim, because Sunshine never actually litigated the issue of Sparks's misconduct.

## IV. Sparks's FMLA Claims

The FMLA provides two mechanisms for plaintiffs to challenge their employers' hindrance of their FMLA rights: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." *Pereda v. Brookdale Senior Living Communities*,

666 F.3d 1269, 1272 (11th Cir. 2012). To establish an FMLA interference claim,

Sparks must show: (1) that he was eligible for FMLA leave; (2) that he was

entitled to FMLA leave; (3) that he gave Sunshine proper notice of the need for

leave; and (4) that Sunshine discharged him because of his need for leave. Sparks

must demonstrate that he was "denied a benefit to which he was entitled under the

FMLA." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir.

2010). Further, "the employer's motives are irrelevant." *Spakes v. Broward County

Sheriff's Office*, 631 F. 3d 1307, 1309 (11th Cir. 2011) (quoting *Martin v. Brevard

County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008)).

To establish an FMLA retaliation claim,[3] on the other hand, a plaintiff must

show that the employer acted intentionally with "an impermissible retaliatory or

discriminatory animus." *Strickland*, 239 F.3d at 1207 (11th Cir. 2001). When no

direct evidence of discriminatory animus exists, courts apply the *McDonnell

Douglas* framework. *Id.* Under that framework, a plaintiff must make a prima facie

case by showing that "(1) he engaged in statutorily protected activity; (2) he

suffered an adverse employment decision; and (3) the decision was causally

related to the protected activity." *Id.* If a plaintiff makes out a prima facie case of

---

[3] The additional element required to establish an FMLA retaliation claim is "a causal
nexus" between the adverse employment action and the plaintiff's FMLA claim. *Spakes*, 631
F.3d at 1309-10 (11th Cir. 2011). *See also*, *Martin*, 543 F.3d at 1268 (11th Cir. 2008).

retaliation, the employer then carries the burden of articulating "a legitimate reason for the adverse action." *Martin v. Brevard County Public Schools*, 543 F.3d at 1268 (11th Cir. 2008) (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)).

Once the employer presents a legitimate reason for the action, the burden shifts back to the employee to show that the reason was pretext for discrimination. *Id.* An employee meets this burden by "presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Schaaf*, 602 F.3d at 1244 (11th Cir. 2010).

### A. Sparks's FMLA Interference Claim

Sparks can establish that he was entitled to a right under the FMLA. The Eleventh Circuit has reasoned that "because the FMLA requires notice in advance of future leave, employees are protected from interference prior to the occurrence of a triggering event, such as the birth of a child." *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1274 (11th Cir. 2012). Sunshine attempts to distinguish *Pereda* from the case at bar by asserting that Sparks was not entitled to a right or leave under the FMLA because he failed to establish that he suffered from a serious health condition. Sunshine further argues that Sparks's

ankle injury is incomparable to a woman's pregnancy. Defendant's Reply at 7

(doc. 42). However, the Eleventh Circuit, in *Pereda*, disagreed with the district

court's reasoning that the plaintiff did not have an "interference claim because she

had not yet experienced a triggering event when she requested her leave." *Pereda*,

666 F.3d at 1273 (11th Cir. 2012).

Sunshine concedes that Sparks meets the eligibility requirements of the

FMLA, but "argues Mr. Sparks was not entitled to a right or leave under the

FMLA because he did not suffer from a serious health condition." Defendant's

Reply at 7. The *Pereda* court, however, noted that "[e]ligibility is but one aspect of

the regulation. Notice of a future trigger event is another." *Pereda*, 666 F.3d

at1274 (11th Cir. 2012). Had Sparks argued that he was denied FMLA leave he

requested, he would have had to establish that he had a serious health condition at

the time he requested leave. Here, however, Sparks claims that he was terminated

for giving notice of his intent to exercise future FMLA rights, a distinction the

*Pereda* court highlights.

Notably, *Pereda* is a case decided in 2012, and the court has little direction

on how to apply it outside of the pregnancy context. Yet, whether the plaintiff's

belief concerning a triggering event later turns out to be false is irrelevant to

*Pereda*'s holding. As Sparks notes in his response to Sunshine's motion for

summary judgment, the *Pereda* court cites *Potts v. Franklin Electric Co.*, 2006 WL 2474964 (E.D. Okla. Aug. 24, 2006), a case in which the court considered a retaliation claim even though the triggering event never occurred. In *Potts*, the plaintiff requested FMLA leave based on a belief that he had mouth cancer, which later turned out to be false. *Id.* at *4. Thus, under *Pereda*, the FMLA entitles Sparks to protection from interference even if his triggering event never occurred or would not eventually qualify for FMLA leave.

However, even if Sparks could establish that he was entitled to a right under the FMLA, Sparks's claim that Sunshine interfered with or otherwise denied this right still fails. The FMLA requires an employee to give an employer 30 days' advance notice of an intention to take leave, if "the necessity for leave. . . is foreseeable," 29 U.S.C. § 2612(e)(1). Further, notice must be "sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C. F. R. § 825.302(c). Employees "must give the employer a reason to believe that [they] are entitled" to leave. *Cruz v. Publix Super Markets*, 428 F.3d 1379, 1385 (11th Cir. 2005). For instance, "if you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the FMLA requires." *Id.*

Taking Sparks's allegations as true, he merely told Myrick and Holland that

35

"the way it was looking, that it was very possible that [he] was going to have to have surgery." Plaintiff Depo. at 122. This statement is insufficient to put Sunshine on notice of Sparks's intent to invoke his right to exercise FMLA leave. *See, e.g.*, *Lee v. U.S. Steel Corp.*, 450 Fed. Appx 834, 838 (11th Cir. 2012) (finding that the plaintiff failed to give his employer sufficient notice where he gave his employer medical certificates stating he had been seen by a health care provider and there "was nothing to indicate that he was unable to perform his job duties during that time period or that he was undergoing a regimen of continuing treatment.").

Sparks stating to Sunshine that it was very possible that he was going to need surgery is not sufficient to put Sunshine on notice of Sparks's intent to take FMLA-qualifying leave. Based on that phrase alone, it was still possible that he would not require surgery, or that he might require surgery but not FMLA leave. It was possible that Sparks's surgery could have been a same day procedure. Simply put, Sunshine could not interfere with Sparks's right to give advance notice of future FMLA-qualifying leave if Sparks never actually gave notice.

*Pereda*'s holding is based on the premise that "[a]s the statute requires advance notice, logic mandates that the FMLA be read to allow a cause of action for employees who, like Pereda, in goodwill exceed the notice requirement."

36

*Pereda*, 666 F.3d at 1274 (11th Cir. 2012). The plaintiff in *Pereda*, however, specifically advised her employer that she was pregnant and would be requiring FMLA leave in the future. *Id.* at 1271. Here, Sparks has failed to meet the notice requirement, less yet exceed it. Based on his failure to provide Sunshine notice of his intent to take FMLA leave, Sparks has failed to make out a claim that Sunshine interfered with his FMLA right to give advance notice of future leave.

### B. Sparks's FMLA Retaliation Claim

In his complaint, Sparks alleges that Sunshine violated his FMLA rights by terminating his employment "because he exercised his rights under the FMLA or because [he] would need FMLA leave in the future." Complaint at ¶ 18. Because Sparks did not exercise FMLA rights by actually requesting FMLA leave, presumably, his argument is that Sunshine retaliated against him for giving notice of the potential need for FMLA leave in the future. In order to make out a retaliation claim, Sparks must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) the decision was causally related to the protected activity. *Strickland*, 239 F.3d at 1207 (11th Cir. 2001). He must further demonstrate that Sunshine "intentionally discriminated against him." *Id.*; *Turner v. Florida Prepaid College Bd.*, 2013 WL 3328748, at *5 (11th Cir. 2013). Because Sparks has no direct evidence of

37

Sunshine's discriminatory animus, the *McDonnell Douglas* framework applies. Sparks must establish the following: "(1) he engaged in statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Id.* Assuming Sparks has established the first two elements, he has and cannot establish the third.

As discussed *supra*, Sunshine has presented a legitimate reason for Sparks's discharge – his many production errors. And, for the reasons stated above with regard to Sparks's workers' compensation retaliatory discharge claim, Sparks cannot demonstrate that Sunshine's reasons for his discharge are pretext for discrimination against employees who exercise FMLA rights. The types of infractions committed by the other employees Sparks referenced are of a different nature and severity than those for which Sparks received write-ups. *See infra* Part II.A. The court does not sit as a super-personnel department, and it is not the court's role to second-guess the wisdom of an employer's business decision, as long as those decisions were not made with a discriminatory motive. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).[4]

---

[4] Additionally, the Supreme Court has indicated that in cases of retaliation in the employment discrimination context, the plaintiff must establish that the retaliation would not have occurred but for the plaintiff's exercise of his rights. *See University of Texas Southwestern Medical Center v. Nassar*, 2013 WL 3155234, at *10 (June 24, 2013). In *Nassar*, the Court determined that the "but-for" causation test it set out for ADEA discrimination claims in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), applied equally to Title VII retaliation claims.

## CONCLUSION

Having considered the foregoing, and being of the opinion that the defendant's motion for summary judgment is due to be granted on all of the plaintiff's claims, the court shall grant said motion by separate Order.

**DONE** and **ORDERED** this 4th day of September 2013.

_____
INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE

---

*Id.* The Court reasoned that where a plaintiff attempts to show that he was discriminated against because he engaged in some protected activity, we must follow *Gross*'s conclusion that the plain meaning of the word "because" means that the employee's action was the sole reason, or but-for cause, of the employer's discrimination. *Id.* (quoting *Gross*, 557 U.S. at 176 (2009)). *Nassar* notes the similarities between the ADEA's antidiscrimination provision and Title VII's antiretaliation provision, which both include the word "because." The ADEA forbids discrimination "because of [an] individual's age" and Title VII forbids retaliation "because [an employee] has opposed" an unfair practice or made a charge under the statute.

The FMLA antiretaliation provision prohibits an employer from "interfering with, restraining, or denying the exercise" of rights under the Act. 29 U.S.C. § 2615. Nonetheless, the Eleventh Circuit has interpreted that provision to prohibit employers from discriminating against an employee "*because* he engaged in an activity protected by the Act." *Pereda*, 666 F.3d 1269 at 1272 (11th Cir. 2012) (emphasis added). Thus, the Supreme Court's determination that the "but for" causation standard applies where an employee alleges discrimination because he engaged in some protected activity also applies in the FMLA context. Without establishing that he gave sufficient notice of his need for FMLA leave, Sparks cannot demonstrate that his statements were the but-for cause of his termination.